UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

SCOTT JOBBER,                    )
                                 )
        Plaintiff,               )
                                 )
    v.                           )    Case No. 2:19-cv-169
                                 )
PLUMROSE USA, INC.,              )
                                 )
        Defendant.               )

## OPINION AND ORDER

Plaintiff Scott Jobber brings this action against his former employer, Defendant Plumrose USA, Inc. ("Plumrose"), claiming unlawful retaliation in violation of the Vermont Fair Employment Practices Act ("VFEPA"), and termination from his employment in breach of the Plumrose employee handbook. Pending before the Court is Plumrose's motion for summary judgment. For the reasons set forth below, the motion for summary judgment is **granted.**

## Factual Background

Plumrose owns and operates six meat manufacturing facilities, including a facility in Swanton, Vermont where Jobber was previously employed. The Swanton facility had approximately 25-40 employees during the time period relevant to this lawsuit. Jobber was hired by Plumrose in May 2012 as the facility's Maintenance Supervisor. He was later promoted to Plant Manager, a position he held for several years prior to his

termination in 2019.  While there is a dispute of fact about the scope of his responsibilities as Plant Manager, including whether he was responsible for the work culture at the plant, it is undisputed that Mr. Jobber's role included ensuring proper plant operations.

In 2017, Plumrose was acquired by JBS.  After the acquisition, the company began to replace its corporate leadership team, headquartered in Chicago, Illinois.  In or around March 2018, Steve Steiert was hired as Plumrose's Head of Operations and assumed oversight of six manufacturing facilities, including the Swanton plant.  In or around September 2018, Jessica Uecker was hired as Plumrose's Head of Human Resources.  Her duties included oversight of human resources functions at Swanton.  Tonya Haggard was hired in or around January 2019, assuming the position of Head of Environmental, Health and Safety for Plumrose.  Ms. Haggard was tasked with ensuring the company's facilities were in compliance with certain regulatory requirements, including OSHA mandates and other regulations related to health and safety.

In addition to these changes at the corporate office, a human resources supervisor position was created for the Swanton facility.  Meredith Hansen was hired on or around October or November 2018 to assume the role of Human Resources Manager at

Swanton.  Because the facility was so small, Ms. Hansen also assumed responsibility for managing safety issues at the plant.

After the JBS acquisition, Mr. Jobber was sent for leadership training at a JBS facility in Greeley, Colorado.  In addition, Mr. Steiert worked with Mr. Jobber in one-on-one meetings and during daily and weekly phone calls.  Mr. Steiert testified in his deposition that he believed Mr. Jobber had moved up too quickly within the organization, and did not have sufficient experience to work at the supervisory level.  Mr. Steiert also believed that Mr. Jobber was not well-suited for the Plant Manager role.

Plumrose maintained an employee handbook that was provided to salaried employees such as Mr. Jobber.  The handbook contained the general employment policies and procedures of the company.  A fundamental dispute in this case is whether the employee handbook created a contract between JBS and its employees, particularly with respect to the company's disciplinary procedures.  The handbook stated, in capitalized, bold, and underlined type: "THE HANDBOOK CONTENTS DO NOT CREATE A CONTRACT BETWEEN JBS AND ANY EMPLOYEE."  Irrespective of the contract question, Mr. Jobber admits that he was an at-will employee who could be terminated at any time, with or without cause and with or without notice.

3

The employee handbook contained an anti-harassment policy
which prohibited "all forms of discrimination and harassment,
including but not limited to, sexual harassment."  The policy
advised employees that they should report all instances of
harassment to management, and stated that "supervisors and
management are expected to take immediate action to deal
promptly with situations involving harassment."  The policy also
prohibited retaliation against employees who complain of sexual
harassment.  It is undisputed that all complaints of sexual
harassment at Plumrose are taken seriously and investigated.
While Plumrose contends that it was Mr. Jobber's responsibility
to administer and enforce the anti-harassment policy at the
Swanton plant, Mr. Jobber submits that the handbook placed that
responsibility on all employees.

The employee handbook also contained a discipline policy,
which provided for various levels of discipline depending on the
circumstances.  Those actions included: a verbal warning; a
written warning; a suspension or final warning; and discharge.
The policy stated that it offered "progressive discipline for
routine issues; however, each situation will be judged based on
its own particular merits."  The policy further explained that
the disciplinary procedure was for guidance only, that any steps
in the procedure could be skipped at the discretion of
management, and that "if the circumstances warrant, an employee

4

may be terminated on the first offense."  Mr. Jobber conceded in his deposition that the company did not have to follow the progressive discipline steps.  His summary judgment papers, however, cite Mr. Steiert's testimony that the company did not "typically" terminate without a suspension and investigation. ECF No. 44-7 at 15 (cited at ECF No. 44-2 at 27).

In or around December 2018 and January 2019, Mr. Jobber was on vacation and Tom Kleckner, Plumrose's Business Development Director, was overseeing the Swanton facility in his absence. After Mr. Jobber returned from vacation, Mr. Kleckner advised him that Ms. Hansen, the Human Resources Manager, had used inappropriate language at the facility.  Mr. Jobber was also told that Ms. Hansen had engaged in inappropriate behavior toward Production Supervisor Steve Martin.  Mr. Kleckner advised Mr. Jobber to speak with Ms. Hansen about her behavior.

Mr. Jobber initiated a discussion with Ms. Hansen on January 7, 2019.  He also emailed Ms. Uecker, head of Plumrose's Human Resources Department, to inform her about Ms. Hansen.  Ms. Uecker then traveled to Swanton to conduct an investigation. The investigation revealed other inappropriate behavior by Ms. Hansen, including texting hourly employees, asking them to watch movies outside of work hours, engaging in innuendo, and snapchatting pictures to employees.  The investigation also found that Production Supervisor Martin had been engaged in

inappropriate and unprofessional conduct.  That conduct allegedly included using unprofessional language, inviting other employees to get drunk after work, smoking marijuana with hourly employees in his garage, and making racist jokes.

There is a factual dispute about whether this sort misconduct pre-dated Ms. Hansen's arrival at the Swanton plant, and whether the record supports Plumrose's assertion that inappropriate conduct by Ms. Hansen and Mr. Martin pre-dated Mr. Jobber's vacation in January 2019.  Ms. Uecker concluded that this sort of behavior was an ongoing part of the culture at the Swanton facility.  Ultimately, Ms. Hansen was issued a written warning for unprofessional behavior, lack of leadership and lack of accountability.  Mr. Martin was given a similar written warning.  While Mr. Jobber wrote the warning to Mr. Martin, he testified that it was based upon an investigation in which he did not participate, and on conduct of which he was not aware.

Mr. Jobber himself also received a written warning.  The warning was a result of the January 2019 investigation, and cited lack of leadership and accountability.  Mr. Jobber now contends that he was punished for the misdeeds of others.

Mr. Jobber was counseled in January 2019 by Mr. Steiert and Ms. Uecker as to his responsibility for the culture and expectations at the Swanton facility.  He was also advised that he needed to be more aware of what was happening at the plant.

Specifically, Mr. Steiert told him, "you can't have your head under the sand, you're the plant manager, you're responsible." Mr. Steiert and Ms. Uecker told Mr. Jobber to reach out to them in any future situations where he needed assistance.

In March 2019, the Swanton facility received legal papers containing allegations by a former temporary employee, Ashley Tremblay.  Ms. Tremblay claimed that several hourly employees had sexually harassed her.  She also claimed sexual harassment by her supervisor, Steve Martin.  After Ms. Hansen showed the legal papers to Mr. Martin, he left the Swanton facility and tendered his resignation.

Ms. Tremblay's allegations also included a claim that Mr. Jobber had terminated her temporary assignment because, in his words, she had become a "distraction" at the Swanton facility. Several male employees had expressed a desire to move their work areas next to Ms. Tremblay's, and Mr. Jobber suspected that they might be interested in her sexually.  Mr. Jobber admits that he told Ms. Tremblay she should not return because she was becoming a "distraction," and concedes that his statement was a "poor choice of words."

Plumrose executives believed that Mr. Jobber's handling of Ms. Tremblay's situation was unacceptable.  Specifically, Plumrose faulted Mr. Jobber for removing Ms. Tremblay instead of addressing the conduct of her male co-workers.  Plumrose also

submits that Mr. Jobber should have known about Ms. Tremblay's situation in relation to her co-workers given the small size of the Swanton plant.

Mr. Jobber argues that the Tremblay incident is not material to this case.  He claims that at the time of his firing, Plumrose informed him that the reason for his termination was an incident involving a trash compactor.  Mr. Jobber also contends that he relied on the judgment and characterization of the situation provided to him by Ms. Tremblay's direct supervisor, Kelly Domina.

In May 2019, Mr. Jobber received a call from the wife of an hourly employee, Mark McLaughlin, who stated that Mr. McLaughlin was having an affair with Human Resources Manager Hansen.  Mr. Jobber immediately advised Ms. Uecker at Plumrose corporate headquarters about the claim.  Ms. Uecker and Ms. Haggard then traveled to Swanton to investigate the allegation.

As part of that investigation, Ms. Uecker reviewed screenshots of text messages she had received from Mr. McLaughlin's wife.  The text messages consisted of communications between Mr. McLaughlin and Ms. Hansen.  Ms. Uecker also interviewed both Mr. McLaughlin and Ms. Hansen, each of whom admitted exchanging inappropriate and flirtatious texts with the other.  Mr. McLaughlin was placed on suspension and ultimately fired.  Ms. Hansen was also placed on suspension, and

sent Ms. Uecker a resignation email before she could be terminated.  There is no dispute that Ms. Hansen was going to be terminated for her behavior.

In her resignation email to Ms. Uecker, Ms. Hansen complained about Mr. Jobber's behavior at the Swanton plant. That behavior allegedly included inappropriate sexual remarks. Mr. Jobber denies making such remarks, and contends that a reasonable juror could infer that Ms. Hansen was retaliating against him for reporting her to management.

Ms. Uecker has stated in an affidavit that she had no reason to doubt the credibility of Ms. Hansen's reports.  On May 22, 2019, she and Ms. Haggard held a follow-up meeting with Ms. Hansen.  During that meeting, Ms. Hansen was critical of Mr. Jobber's leadership at the Swanton facility, explaining that employees were afraid to talk to him out of fear that he would scold or retaliate against them.  Ms. Hansen also reported that Mr. Jobber stated openly that he did not want to interact with employees, and would not go onto the production floor.  Mr. Jobber also allegedly stated that after Ms. Uecker's January 2019 investigation, he would never report to her again.  He reportedly referred to Ms. Uecker as an "evil fucking bitch," and said that "we will never fucking call her again."

Ms. Uecker and Ms. Haggard interviewed two other witnesses in addition to Ms. Hansen, each of whom allegedly corroborated

Ms. Hansen's reports of verbal abuse and failed leadership.  One of the witnesses also corroborated Ms. Hansen's report that Mr. Jobber had made sexually inappropriate comments.  Mr. Jobber concedes that Ms. Hansen raised these issues with Ms. Uecker and Ms. Haggard, but denies the veracity of her claims and disputes whether her criticisms were corroborated.

During that same May 22, 2019 meeting, Ms. Hansen reported that an hourly employee had climbed into a trash compactor without locking it out.  The lock out is reportedly required by OSHA's lockout/tagout requirements.  In his deposition, Mr. Jobber testified that it was Ms. Hansen who ordered the employee to act in violation of the OSHA requirements, and that she concealed the incident for months.

After completing her follow-up investigation, Ms. Uecker advised Mr. Steiert of the reports regarding Mr. Jobber's leadership.  Mr. Steiert then travelled to Swanton himself.  On May 23, 2019, he held a meeting with Mr. Jobber and informed him that he was being terminated.  Plumrose contends that the firing related solely to ongoing leadership issues that became apparent during the various investigations between January 2019 and May 2019.

Mr. Jobber contends that Ms. Uecker and Mr. Steiert had decided to fire him prior to the May 2019 investigation.  For support, he references Mr. Steiert's notes from May 19, 2019,

three days prior to Ms. Uecker's arrival in Swanton.  Those notes allegedly reflect Ms. Uecker's statement that, in addition to firing Mr. McLaughlin and Ms. Hansen, Plumrose should fire Mr. Jobber as well, and that she had obtained approval from Plumrose corporate to do so.  ECF No. 44-15 at 1.  Mr. Steiert has testified that the decision to fire Mr. Jobber was not made until May 22, 2019, ECF No. 38-17 at 56, and that it was "ultimately" his decision whether to fire Mr. Jobber.  ECF No. 45-3 at 3.

After the exit interview, Mr. Steiert drafted a memorandum summarizing the substance of his exit interview with Mr. Jobber. That memorandum states, in part, that Mr. Steiert informed Jobber: "we had found serious safety & training gaps as well as unprofessional behavior including employees entering a compactor without locking it out.  Additionally, I reminded [Jobber] that we found some of the same issues in January and it continued to happen.  I told [Jobber] that we had several management terminations for unprofessional behavior and a lawsuit as well." ECF No. 44-8 at 1.  Those latter events presumably included Mr. McLaughlin's termination, Ms. Hansen's resignation, and the Tremblay lawsuit.[1]

---

[1] According to Mr. Jobber's summary judgment filings, the exit interview memorandum cited only the trash compactor incident as the reason for termination.  ECF No. 44-2 at 26 (response to Defendants' Statement of Undisputed Material Facts paragraph

The Complaint in this case asserts three legal claims.  The first is for retaliatory discharge, alleging that Mr. Jobber was fired for reporting unprofessional behavior, including sexual harassment, at the Swanton plant.  Count Two of the Complaint alleges breach of contract in the form of a retaliatory discharge, claiming that the employee handbook barred Plumrose from retaliating against employees who reported sexual harassment and other unprofessional behavior.  Count Three alleges breach of contract for failure to comply with the disciplinary process set forth in the employee handbook.  Plumrose now moves for summary judgment on all three causes of action.

## Discussion

### I.  Summary Judgment Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents ... [and] affidavits or declarations," Fed. R. Civ. P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a

---

61).  The Court finds no disputed issues of fact with respect to the contents of the memorandum, as it speaks for itself.

genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may support an assertion that there is no genuine dispute of a particular fact by "showing ... that [the] adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(B).

If the moving party fulfills its burden, the nonmoving party must demonstrate a genuine issue of material fact.  Fed. R. Civ. P. 56(c)(1)(A); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248. Courts must "draw all rational inferences in the non-movant's favor."  *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014) (citing *Anderson*, 477 U.S. at 248).  At the summary judgment stage "the judge must ask ... not whether ... the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."  *Anderson*, 477 U.S. at 252.  "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."  *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005); *see also Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e] [summary judgment]

standard, the court should not weigh evidence or assess the credibility of witnesses.").

## II.  VFEPA Claim of Retaliation

Mr. Jobber claims protection from retaliation under the Vermont Fair Employment Practices Act.  The VFEPA is an anti-discrimination statute "patterned after Title VII of the [federal] Civil Rights Act."  *Lavalley v. E.B. & A.C. Whiting Co.*, 166 Vt. 205, 209, 692 A.2d 367, 369 (1997).  When applying the VFEPA's burdens and standards of proof, the Vermont Supreme Court follows federal case law.  *See Hodgdon v. Mt. Mansfield Co.*, 160 Vt. 150, 161, 624 A.2d 1122, 1128 (1992).  The Vermont Supreme Court has noted, however, that "we may depart from federal interpretations . . . when we construe our own fair employment practices law."  *Payne v. U.S. Airways, Inc.*, 2009 VT 90, ¶ 11, 186 Vt. 458, 464, 987 A.2d 944, 949.

To assert a viable retaliation claim under the VFEPA, "a plaintiff bears the initial burden of proving that [he] was engaged in a protected activity, that the employer was aware of that activity, that [he] suffered an adverse employment action, and that there was a causal connection between the protected activity and the adverse employment action."  *Connors v. Dartmouth Hitchcock Med. Ctr.*, 12 F. Supp. 3d 688, 699 (D. Vt. 2014) (citing *Gallipo v. City of Rutland*, 2005 VT 83, 178 Vt. 244, 882 A.2d 1177).  Once a *prima facie* case is established,

14

"the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Robertson v. Mylan Labs., Inc.*, 2004 VT 15, ¶ 26, 176 Vt. 356, 848 A.2d 310 (quotation omitted).  If the employer produces evidence to satisfy its burden, the presumption of discrimination disappears, and the plaintiff has the burden to prove that the employer's justification is a pretext for discrimination.  *Id.* ¶ 27.  To show pretext, a plaintiff must rebut "the proffered reason with facts from which a factfinder could reasonably conclude that the proffered reasons are unworthy of credence." *Gauthier v. Keurig Green Mountain, Inc.*, 2015 VT 108, ¶ 33, 200 Vt. 125, 129 A.3d 108.

Mr. Jobber claims that he was fired for reporting Ms. Hansen to Ms. Uecker, and that the act of reporting was a protected activity.  Plumrose contends that reporting Ms. Hansen was part of Mr. Jobber's job as Plant Manager, and was not a protected civil rights activity under the VFEPA.  Plumrose further argues that even assuming protected activity, Mr. Jobber was terminated for other, legitimate reasons and thus cannot show the required causal connection or pretext.

### A.    Protected Activity

Plumrose cites federal civil rights law for the proposition that "[t]o the extent an employee is required as part of her job duties to report or investigate other employees' complaints of

discrimination, such reporting or investigating by itself is not a protected activity . . . ." *Littlejohn v. City of New York*, 795 F.3d 297, 318 (2d Cir. 2015). *Littlejohn* distinguished between "merely reporting or investigating other employees' complaints of discrimination, which simply fulfills a personnel manager's daily duties, and communicating to the employer the manager's own 'belief that the employer has engaged in ... a form of employment discrimination,' which 'virtually always constitutes' opposition notwithstanding the employee's underlying job responsibilities." *Id.* at 318 (quoting *Crawford v. Metro. Gov't of Nashville & Davidson Cty.*, 555 U.S. 271, 276, (2009)); *see also Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1082 (9th Cir. 1996) (holding that an "employee does not receive special protection under Title VII simply because the employee handles discrimination complaints").

Here, it is undisputed that Mr. Jobber was counseled in January 2019 by Mr. Steiert and Ms. Uecker to reach out to them if he needed assistance with personnel matters. When notified of the alleged affair between Ms. Hansen and Mr. McLaughlin in May 2019, he did just that. Mr. Jobber was not expressing displeasure with his employer, was not forwarding grievances on behalf of other employees, and did not contend that he himself was being subjected to discrimination or harassment. Instead, in keeping with the mandate from the employee handbook that

supervisors take swift action in response to suspected harassment, and consistent with his directions from corporate management, Mr. Jobber reported what he knew to corporate headquarters.  Such reporting is not the sort of activity that is protected under the VFEPA.  *Cf. Lewis-Smith v. W. Kentucky Univ.*, 85 F. Supp. 3d 885, 909 (W.D. Ky. 2015) ("In order for employees in human resources positions to claim retaliation they need to first clearly establish that they were engaged in protected activities other than the general work involved in their employment.")(citing *McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1486-87 (10th Cir. 1996)).  Accordingly, Mr. Jobber has failed to satisfy the first requirement for a VFEPA claim – engagement in a protected activity – as a matter of law.

**B.   Causation and Pretext**

Plumrose argues in the alternative that, even assuming protected activity, there are no genuine issues of material fact with respect to questions of causation and pretext.  Mr. Jobber claims that he was a victim of retaliation from both Ms. Hansen and Ms. Uecker.  With respect to Ms. Hansen, he contends that her post-resignation email was an effort to "accus[e] the person who was instrumental in her firing."  ECF No. 44 at 25.  As to Ms. Uecker, Mr. Jobber argues that she was too "savvy" to believe Ms. Hansen's complaints about him, and that "[t]he far more plausible explanation is that Ms. Uecker utilized facially

17

unreliable statements from Ms. Hansen to deflect blame away from herself for having hired the sexual predator Ms. Hansen in the first place." *Id.* at 26.

It is undisputed that Ms. Hansen had no power to either discipline or terminate Mr. Jobber.  The causation and pretext analyses therefore turn to Ms. Uecker and Mr. Steiert, as they were the Plumrose executives most closely associated with Mr. Jobber's firing.  Mr. Jobber contends, without any record support, that Ms. Uecker was acting in retaliation for his reports of misconduct by Ms. Hansen.  Plumrose denies this speculative assertion, and submits instead that Mr. Jobber was warned, counseled, and then terminated by Mr. Steiert for poor leadership.

The undisputed record at summary judgment displays mounting evidence of Mr. Jobber's poor job performance.  In January 2019, he was warned about a lack of leadership and accountability. Though he claims the warning was unfair, it nonetheless reflected the opinion of Plumrose management with respect to the unacceptable work culture, and the role of the Plant Manager at the Swanton facility.  In March 2019, when it was revealed that Mr. Jobber had removed Ms. Tremblay from her position because, in his words, she was a "distraction," Plumrose corporate was clearly displeased.  Finally, in May 2019, Ms. Hansen's email to Ms. Uecker was highly critical of Mr. Jobber's management style,

18

reporting that plant employees were afraid of him, that he refused to go onto the production floor, and that he had made sexually inappropriate remarks.  Though Mr. Jobber denies Ms. Hansen's allegations and any alleged corroboration, Ms. Uecker reports receiving corroboration from more than one witness.

Mr. Steiert's exit interview memorandum set forth several grounds for Mr. Jobber's termination, including: safety and training issues; unprofessional behavior, which included the trash compactor incident; terminations of other managers at Swanton for unprofessional behavior; and the filing of a lawsuit against Plumrose.  The memo also stated that some of the problems identified in the January 2019 warning had continued. In his deposition, Mr. Steiert cited inappropriate behavior at the plant as a primary cause of Mr. Jobber's termination, ECF No. 44-7 at 10, while Ms. Uecker's testimony identified poor leadership, ECF No. 44-6 at 13-14.

Mr. Jobber now contends that "the only reason identified in the exit interview memo drafted by Steve Steiert was the trash compactor incident involving a particular employee."  ECF No. 44 at 24.  That statement does not square with the text of the Steiert memo, which Mr. Jobber has attached to his summary judgment opposition as an exhibit.  ECF No. 44-8 at 1.  While Mr. Jobber argues that summary judgment should not be granted where there are "'weaknesses, implausibilities, inconsistencies,

or contradictions in the employer's proffered, legitimate, non-retaliatory reason for its action," and viewing the facts in his favor, he has failed to establish such flaws in this case.  ECF No. 44 at 24 (quoting *Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 846 (2d Cir. 2013)).  The record of warnings and discipline, the exit memorandum, and the deposition testimony each support Plumrose's argument that Mr. Jobber's termination was not motivated by, or a pretext for, retaliatory intent.

Mr. Jobber also argues that the decision to terminate him was made prior to Ms. Uecker's May 2019 investigation, and that the investigation itself was pretextual.  Mr. Steiert's testimony made clear, however, that he bore the ultimate responsibility for firing Mr. Jobber, and that he did not make the decision until May 22, 2019.

Whether the decision to terminate Mr. Jobber was correct, or was fully justified by the circumstances, is not before the Court.  Nor is the question, raised by Mr. Jobber, of whether the allegations against him were credible or corroborated.  The question instead is what motivated his employer.  *See McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) (courts "are decidedly not interested in the truth of the allegations against plaintiff. [They] are interested in what '*motivated* the employer'; the factual validity of the underlying imputation against the employee is not at issue.") (quoting

*United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S.
711, 716 (1983) (emphasis in *McPherson*)).

While Mr. Jobber argues that Plumrose was motivated to
retaliate against him, he offers only conjecture to support his
claim, while the record evidence shows a pattern of questionable
performance underlying his eventual termination.  Accordingly,
even assuming a *prima facie* showing that he was engaged in
protected activity when he reported to Ms. Uecker, Mr. Jobber
cannot show either that such activity was a cause of his
termination, or that his termination was pretextual.  Moreover,
the undisputed evidence supports Plumrose's contention that Mr.
Jobber was fired for legitimate, non-retaliatory reasons.
Finally, even when viewing the facts in a light most favorable
to Mr. Jobber, the record fails to support his claim that
Plumrose's reasons for termination "are unworthy of credence."
*Gauthier*, 2015 VT 108, ¶ 33.  Plumrose's motion for summary
judgment on the VFEPA claim is therefore granted.

## III. Breach of Contract: Retaliatory Discharge

Mr. Jobber's second claim for relief is for breach of
contract, asserting that the alleged acts of retaliation
discussed above violated the company's employee handbook.
Plumrose moves for summary judgment on this claim as well,
arguing that the employee handbook was not a contract, that any
handbook statements about retaliation did not modify Mr.

Jobber's status as an at-will employee, and that there was no
unlawful retaliation.

The employee handbook itself stated, in bold, underlined
and capitalized type, that it did not create a contract between
JBS and its employees.  The handbook also provided:

> Nothing in this handbook binds JBS or any employee to
> any specific procedures, policies, benefits, pay,
> working conditions, or privileges of employment.
> Employment at JBS is at-will which means that as an
> employee, you are completely free to leave the Company
> at any time you choose, and the Company has the same
> right to end the employment relationship, with or
> without notice, with or without cause.

The handbook further warned that "[r]etaliation against
individuals who raise concerns of all forms of violence and
harassment, including sexual harassment is strictly prohibited."

"It is axiomatic that an at-will employee may be discharged
at any time with or without cause, unless there is a clear and
compelling public policy against the reason advanced for the
discharge, or unless the at-will relationship has been
modified."  *Ross v. Times Mirror, Inc.*, 164 Vt. 13, 23, 665 A.2d
580, 586 (1995) (quotation, citation, and emphasis omitted).
With respect to modification of the employment relationship, the
Vermont Supreme Court has recognized that an employer may assume
legal obligations through written policies, including an
employee handbook.  *See Dillon v. Champion Jogbra, Inc.*, 175 Vt.
1, 5, 819 A.2d 703, 707 (2002); *see also Raymond v. IBM Corp.*,

22

954 F. Supp. 744, 748 (D. Vt. 1997) (noting that under Vermont law "[a]t-will employment contracts may be modified by . . . the personnel policies or practices of the employer").

Such written policies, and any resulting obligations, are not automatically nullified by disclaimer provisions. *See Dillon*, 175 Vt. at 8 (determining that provisions in employee manual that were "inconsistent with the disclaimer at the beginning of the manual" could form the basis for a cause of action); *Farnum v. Brattleboro Retreat, Inc.*, 164 Vt. 488, 494, 671 A.2d 1249, 1254 (1995) ("The mere inclusion of boilerplate language providing that the employee relationship is at will cannot negate any implied contract and procedural protections created by an employee handbook."). "The effectiveness of a disclaimer depends on the circumstances." *Ross*, 164 Vt. at 19. In *Ross*, the Vermont Supreme Court clarified that "[g]eneral statements of policy will not meet the requirements of a unilateral contract. In contrast, definitive policies, which expressly or impliedly include a promise for specific treatment in specific situations, especially when the employer expects the employee to abide by the same, may be enforceable in contract." 164 Vt. at 20 (citations omitted).

Mr. Jobber's contract claim is based on the employee handbook's assurance that retaliation for reporting sexual harassment is "strictly prohibited." Absent from the handbook

is any statement of specific steps to be taken in response to such retaliation aside from "immediate action."  Plumrose therefore submits that the handbook contains only a general statement of policy.  The Vermont Supreme Court, however, has held that a company handbook's prohibition on retaliation may modify an at-will employment relationship.  *Foote v. Simmonds Precision Prod. Co.*, 158 Vt. 566, 571, 613 A.2d 1277, 1280 (1992) (upholding jury's determination that handbook's prohibition on retaliation for using the company's grievance procedure constituted a modification).  Although *Foote* was an action for promissory estoppel, it is arguable under Vermont law that an express prohibition on retaliation in certain circumstances can modify the at-will employment contract.  *See id.*

Nonetheless, as discussed above, the factual record does not support Mr. Jobber's claim of retaliation.  While he speculates that Ms. Hansen was retaliating against him because he reported her to management, and that Ms. Uecker was retaliating because she had hired Ms. Hansen, the undisputed facts show a series of performance issues that ultimately resulted in Mr. Jobber's termination.  In contrast, Mr. Jobber's claims of retaliation are largely unsupported.  Accordingly, even assuming a contractual retaliation provision in the employee handbook, no reasonable jury could find retaliation,

24

and Mr. Jobber's claim fails as a matter of law.  Plumrose's
motion for summary judgment on the contract-based retaliation
claim is therefore granted.

## IV.  Breach of Contract: Disciplinary Policy

Mr. Jobber's second contract claim contends that the
employee handbook created a contractual agreement to engage in
progressive discipline.  Again, the existence of a contract
depends upon the circumstances.  Here, the disciplinary
procedures outlined in the employee handbook left management
with significant discretion as to which steps, if any, to employ
prior to terminating an employee.  As noted above, the handbook
allowed management to tailor discipline to "the degree of
seriousness of the particular circumstances," and specifically
allowed that "if the circumstances warrant" an employee could be
terminated for a first offense.  The handbook also explained
that the disciplinary policy was merely "guidance," and that any
steps could be skipped.  Mr. Jobber conceded in his deposition
that the steps outlined in the handbook were not required.

The Vermont Supreme Court has noted that "disciplinary
procedures are not inconsistent or in conflict with the at-will
doctrine."  *Id.* at 21.  And while a written policy may "create
an enforceable promise to use those procedures, . . . [t]he
critical inquiry is, of course, whether the procedure" was
specific enough to "amount[] to an enforceable promise."  *Id.* at

21-22.  In *Ross*, the Vermont Supreme Court found that where "the
policy expressly leaves the disciplinary sanction to the
employer's discretion . . . defendant's handbook policy, by
itself, does not create an enforceable promise to terminate for
cause or only after disciplinary action had been taken."  *Id.* at
21.  *Ross* also held that in order for the handbook to be
binding, it must contain statements that are "definitive in form
. . and demonstrate an objective manifestation of the employer's
intent to bind itself."  *Id.* at 20.

The employee handbook in this case made clear that
management was not bound to a specific disciplinary process.
Instead, the policy was set forth in terms of options, none of
which were mandatory and any of which could be bypassed.  Under
Vermont law, that sort of policy does not create a contract or
alter the at-will employment relationship.

Mr. Jobber contends that, at the very least, the
disciplinary policy is ambiguous, thus creating a question of
fact for the jury about whether his at-will employment was
modified by a contractual agreement.  The Vermont Supreme Court
has explained that "[w]hen the terms of a manual are ambiguous .
. . or send mixed messages regarding an employee's status, the
question of whether the presumptive at-will status has been
modified is properly left to the jury."  *Dillon*, 175 Vt. at 6–7.
"The question of whether a written manual is ambiguous is a

determination of law." *Id.* at 7.  In *Dillon*, the court found
ambiguity where the employee handbook set out an "elaborate
system governing employee discipline and discharge" that was
"mandatory in tone."  *Id.* at 3, 7.  Plumrose's handbook, in
contrast, "was permeated with conditional and cautionary
language that communicated the absence of an intent to be bound
to the use of progressive disciplinary measures."  *Smith v.
Shaw's Supermarkets, Inc.*, 809 F. App'x 30, 32 (2d Cir. 2020)
(concluding that employer "unambiguously . . . reserve[d] the
right to use progressive discipline at its discretion, rather
than binding itself to do so in every case").  The Court
therefore finds no ambiguity for a jury to consider.

**V.   Public Policy**

     Mr. Jobber's final argument at summary judgment is that his
termination violated public policy.  Briefly stated, he claims
that his treatment violated "community common sense and common
conscience," and would be "cruel or shocking to the average
man's conception of justice."  *Payne v. Rozendaal*, 147 Vt. 488,
492-93, 520 A.3d 586, 588 (1986).  In *Payne*, the Vermont Supreme
Court held that a person could not be discharged from employment
solely on the basis of age.  *Id.* at 494.  At the time of the
employee's termination, age discrimination was not unlawful
under the VFEPA.  *Id.* at 492.  Soon thereafter, the Vermont
Legislature amended the statute.  *Id.; see* 21 V.S.A. § 495.

This case carries no such broad policy concerns.  Mr. Jobber was an at-will employee who was discharged for poor performance.  Prior to his termination he was warned and counseled, and management found continued performance issues. Nothing in those undisputed facts raises concerns of public policy.

## Conclusion

For the reasons set forth above, Plumrose's motion for summary judgment (ECF No. 37) is **granted.**

DATED at Burlington, in the District of Vermont, this 7th day of June, 2021.

/s/ William K. Sessions III
William K. Sessions III
U.S. District Court Judge